AMSBURY ET AL. *v.* HARPER.

[No. 12,605. Filed June 29, 1927. Rehearing denied October 26, 1927. Transfer denied February 24, 1928.]

120

*Bingham & Bingham, James Bingham, Remster A. Bingham, Carl E. Wood, S. Mahlon Unger* and *Newberger, Simon & Davis*, for appellants.

*Ralston, Gates, Lairy, VanNuys & Barnard*, for appellee.

McMahan, J.—This is an action by appellee against appellants and others to recover damages on account of alleged fraud on the part of appellants and such other persons whereby appellee was induced through a fraudulent conspiracy to purchase capital stock of the Van Briggle Motor Device Company, such stock being alleged to be worthless.

The complaint alleges the incorporation of the Van Briggle Motor Device Company under the laws of this state in 1915, with a capital stock of $150,000; that defendants Lilburn H. Van Briggle and Henry S. Rominger were two of the incorporators and were directors during the entire life of the company; that defendant Mattern was a director from and after January, 1916, and defendants Stout, Buning and Grishaw from and after the early part of 1919; that the capital stock was increased, in January, 1918, to $300,000, in February, 1919, to $500,000, and in June, 1920, to $500,000 common and

$800,000 preferred stock; that a ten per cent. dividend was declared and paid in January, 1920; that said directors represented to plaintiff that said dividend was being paid out of net earnings and that the company had made net earnings sufficient to pay a 100 per cent. dividend, when, in fact, said dividend was paid out of borrowed money, and the said statements were false and made for the purpose of inducing appellee to purchase additional stock in the company; that appellee, relying upon and believing such representations, did purchase additional stock as follows: On January 19, 1920, two shares for $400, February 23, 1920, thirty shares for $6,000; that said above named directors knew said dividends so paid had not been earned and knew the representation that the company had earned and was able to pay a 100 per cent. dividend was false and was made for the purpose of deceiving plaintiff and other prospective purchasers of stock; that said directors fraudulently concealed the fact that the company was insolvent and not earning sufficient money to pay dividends; that the president of the company, with the knowledge, consent and approval of defendant directors, made false statements to plaintiff and others by sending out letters and literature to the effect that the company had made arrangements to build a factory in Canada, and that the money invested in stock would be used in building such factory; that financial statements of the company showed the company possessed a surplus of more than $400,000 after all liabilities were deducted, when, in truth, such statements were false, and were known by the directors to be false and that plaintiff, believing the same to be true and relying thereon, purchased capital stock of the company in the amount of $15,650. It also alleges that appellants Amsbury and Shepard, knowing all the above facts, conspired with the directors and the officers of the company to induce ap-

pellee to purchase stock of the company; that Shepard was an employee of the company in the capacity of a stock salesman; that Amsbury was a prominent business man and farmer of Tipton county, and was well known to plaintiff as a successful and dependable man whose judgment was entitled to great weight; that Amsbury and Shepard came to plaintiff's house a number of times and stated to plaintiff that Van Briggle was the owner of certain patents of great value; that the motor device company was solvent and earning large sums of money and that Amsbury had invested large sums of money in the purchase of stock of the company; that the company had built a large factory and was making large profits on articles manufactured by it; that the directors of the company were all men of influence and stability and had invested large sums of money in the company and were capable and trustworthy men. The complaint then alleges that plaintiff, being well acquainted with Amsbury and Shephard, relied upon their said representations and believed them to be true; that Shepard arranged a meeting between appellee and defendants Van Briggle, Rominger and Stout at the factory in Indianapolis, at which meeting Rominger and Stout stated to appellee that they had invested large sums of money in the purchase of stock of the company and that the company was solvent, its stock worth much more than the par value, that the company was making money, that Stout and Rominger said they were giving the business their personal attention and that the business affairs of the company was on a firm and substantial basis and that Van Briggle had been offered $250,000 for his patents. That appellee, relying on the representations of appellants and Van Briggle, in April, 1919, purchased thirty shares of the stock of the company, paying therefor $3,750; in May, 1919, he purchased

ten shares for $1,250, and on July 12, 1920, twenty shares for $3,000.

It is also alleged that all the statements so made to appellee were false, were known by the defendants when made to be false, were made for the fraudulent purpose of inducing appellee to buy stock in the company, and that appellee, believing the same to be true, and in reliance upon the truthfulness of such statements, purchased stock in the company which is alleged to have been insolvent.

While appellants Amsbury and Rominger complain of the action of the court in overruling their motion to make the complaint more specific and to separate the complaint into separate and several paragraphs, they concede the overruling of these motions is not reversible error.

Appellant Amsbury next contends the court erred in overrruling his demurrer to the complaint. His contention is that the complaint does not state facts sufficient to state a cause of action and that several causes of action have been improperly joined. In support of this contention, he says the complaint does not allege that he at any time was a director or officer of the company, or that he made any of the alleged false representations or did or performed any of the alleged fraudulent acts on the part of the president of the company, or that he did any other act or thing to induce the purchase of any of the thirty-two shares of stock first referred to in the complaint, or that he had any knowledge of the falseness of any statements or of the fraudulent purpose of any act that it is alleged appellee relied upon and believed in purchasing the thirty-two shares of stock, and that the only allegation connecting him with any of the alleged fraudulent acts is the allegation that, knowing said facts, he and appellant Shepard conspired with the directors and officers of the company to induce

appellee to purchase the thirty-two shares of stock, but that there is no allegation that he or any one else did anything pursuant to said alleged conspiracy; that it is alleged that appellee purchased all of the stock in question in reliance upon and believing the statements to be true that are alleged to have been made by the directors, and that there is no allegation that he, Amsbury, had anything to do with making any of such statements, and there is no allegation of facts sufficient to create any liability on his part on account of any of the alleged statements of the directors; there is no allegation of falseness of the alleged representations made by him, and alleged to have been relied upon by appellee in making the several purchases of the shares of stock aggregating the seventy shares last referred to in the complaint; and there are no allegations of any facts that establish that the alleged representations made by him were the proximate cause of appellee purchasing any of the stock of the company; and that the facts alleged in the complaint show that appellee did not rely upon the alleged representations made by appellant. Amsbury, there being no allegation that he was induced to purchase any of the stock in question by reason of any statement or act of this particular appellant.

The memorandum filed with the demurrer, in substance, states that the complaint is not sufficient because the acts charged are the individual acts of each defendant; that no acts of fraud are charged, but mere conclusions, which fail to show any conspiracy between Amsbury and the other defendants, and that an action for damages cannot be maintained jointly against various tort-feasors among whom there is no concert or unity of action and no common design but whose independent acts united produce the damages.

We must consider the action of the court in overruling the demurrer in light of the objections set out in the

memorandum, rather than in the light of the objections made in this court, as all objections to the complaint not set out in the memorandum filed with the demurrer are waived. Acts 1911 p. 415, §362, cl. 6, Burns 1926.

The complaint first alleges that the directors of the company, on January 13, 1920, declared a ten per cent. dividend and stated to appellee that the company had prior thereto made net earnings sufficient to pay a 100 per cent. dividend; that said ten per cent. dividend was not paid out of earnings, but was paid out of borrowed money, and that the company did not have earnings in any sum; that the ten per cent. dividend was declared, and the false representations concerning the earnings of the company made, for the purpose of inducing appellee to purchase additional stock in the company and that appellee, relying upon such representations and believing them to be true, did purchase, at various times thereafter in January and February, 1920, thirty-two additional shares of such stock, for which he paid $6,400; that the president of the company, with the knowledge and consent of the named directors, sent out certain letters and literature concerning the condition of the company, which they knew were false, for the purpose of inducing appellee and others to purchase stock and that appellee, relying upon the truthfulness of such statements, purchased stock in the sum of $15,650; that appellants Amsbury and Shepard, knowing of the facts, "conspired and agreed with said directors and with the officers of the Company to induce appellee to purchase the above mentioned stock." This last statement, to the effect that Amsbury and Shepard, having knowledge of the fraudulent and false acts and statements of the directors of the company and knowing the purpose the directors had in paying the stock dividend and in making false statements and in

knowing the president was sending out letters and literature containing false statements as to the financial conditions, with knowledge that all of such acts were done for the purpose of inducing appellee and others to buy stock in the company, conspired and agreed with the directors and officers to induce appellee to purchase the stock, when considered in connection with the remainder of the complaint as hereinbefore set out, states facts sufficient to state a cause of action as to appellant Amsbury. There was no error in overruling his demurrer to the complaint. None of the other appellants challenge the sufficiency of the complaint.

The stock first mentioned in the complaint as having been purchased by appellee in 1920, and being thirty-two shares, for which he paid $6,400, was not the first stock of the company which had been purchased by appellee. It is alleged that in April, May and July, 1919, appellee purchased seventy shares of stock for which he paid $9,250. The thirty-two shares of stock purchased in 1920 are referred to in the complaint as "additional" stock. There was a verdict and judgment against Amsbury, Shepard, Stout and Rominger for $8,000, the cause having been dismissed as to all other defendants. The four defendants against whom judgment was rendered have appealed, and for convenience we will hereafter refer to them jointly as "appellants."

Appellants have presented more than sixty reasons why the court erred in overruling their motion for a new trial. These contentions are presented in a brief of more than 800 pages. If we were to give each contention an extended discussion, this opinion would be unnecessarily long, so we will confine our discussion to the material questions presented and state only our final conclusions as to the other questions.

Appellants' main contention is that the verdict is not sustained by sufficient evidence. This contention can-

not be sustained. The evidence is ample to sustain the verdict as to all appellants. Among the salient facts disclosed by the evidence are the following: The Van Briggle Motor Device Company was incorporated September 1, 1915, with $150,000 capital stock, $125,000 of which was given to Lilburn H. Van Briggle for "work and genius" in developing a carburetor, for which application for a patent had been made. A patent was issued to Van Briggle in June, 1916, and in January, 1918, the company entered into a contract to pay him a royalty of fifty cents on each carburetor sold. Later, another contract was entered into to give him a royalty on another carburetor which he had patented. Van Briggle also secured a patent for a shock absorber, which, in 1920, was declared an infringement on a patent theretofore issued to another. Appellant Rominger and Van Briggle, with others, were the incorporators of the company. They were directors from the time of the incorporation until it went into the hands of a receiver in 1920, Van Briggle being president, and Rominger treasurer during that time. The evidence does not disclose that much effort was made to sell stock until after a meeting of the directors held in December, 1916. At this meeting, at which appellant Rominger was present, Van Briggle urged extra effort be put forward to push development, and expressed the hope that if they were successful in their stock sale, the company would soon be manufacturing carburetors in quantity production.

A casual reading of the records of the board of directors discloses that, after the company was organized, it was the plan of the organizers to secure men of means as stockholders and then to elect them directors. At a meeting held December 11, 1917, the question of increasing the capital stock was discussed. At the stockholders' meeting held January 8, 1918, Van Briggle and Rominger

made statements concerning the business affairs of the company to the effect that the company was on a substantial paying basis and that profits from sales were sufficient to meet all expenses. Following this, the stockholders voted to increase the capital stock from $150,000 to $300,000. The additional stock to be sold at par, the amount to be sold to be left to the directors. The directors, on the same day, ordered the sale of $50,000 of stock at par, and voted to secure the services of an expert stock salesman. It appears that at that time the company had outstanding notes which would be due in a few days, and that there would be no money with which to pay them unless some stock was sold, and it was decided to renew them until they had sufficient funds with which to pay them. At a meeting held April 9, 1918, Rominger reported that he had received a Liberty Bond for $100 in payment of stock and, on account of the state of the company's treasury, he recommended its sale, which the board authorized. The record of the meeting held April 14, 1918, discloses that by reason of no funds being in the treasury, Rominger had advanced out of his own funds $3,811. Van Briggle reported that an Indianapolis bank had taken up the sale of the stock, and he thought that within a reasonable time sufficient stock would be sold to meet all demands upon the company. September 10, 1918, Van Briggle stated he thought it would be advantageous to authorize the sale of an additional $60,000 of stock, which was done, and outstanding stock subscriptions were ordered collected. At a meeting held September 20, 1918, Van Briggle was authorized to sell stock and collect unpaid subscriptions. On October 8, 1918, Van Briggle reported it would be necessary to raise additional funds and recommended the sale of additional stock and the sale of $50,000 stock was authorized. The matter of

insuring the life of Van Briggle for $25,000 was discussed, but action was postponed until an audit of the books could be had so as to know whether the financial condition of the company would warrant it. November 12, 1918, Rominger reported to the directors that the company owed $10,000 to banks and also bills to about the same amount; that arrangements would have to be made to take care of them, and that it would take from $2,000 to $4,000 a week to take care of the financial demands of the company.

An annual meeting of the stockholders was held January 14, 1919. At this time the company had 2,566½ shares of stock outstanding, including the 1,250 shares which had been issued to Van Briggle in September, 1915, for his work and genius in developing a carburetor, a patent for which had not yet been issued, and which was never owned by the company. The then auditor of the company, who had only been with the company a short time, presented a report which was read at this meeting. This report stated that prior to July 1, 1918, the method of bookkeeping used by the company was not an approved method; that on that date a new method had been adopted, not based on data given before, but on an inventory, and that this report was based on that inventory. This report made by the auditor was in the nature of a balance sheet showing the condition of the company as of December 21, 1918. It indicated assets aggregating $463,663.14. It showed an alleged surplus of $161,687.06. The liabilities were as follows: Notes Payable, $48,626.08; Capital Stock, $253,350; and Surplus, $161,687.06. The assets and liabilities each aggregating $463,663.14.

Among the items so listed as assets, we call special attention to two, listed as "Manufacturing Contracts" covering the right to make and sell Carburetor Model H, valued at $125,000, and the

right to make and sell Carburetor Model P, valued at $150,000. There is no evidence that the company ever paid anything for either of these manufacturing contracts. The evidence shows that, at a prior meeting of the board of directors, the corporation was authorized to enter into a contract with Van Briggle for the right to manufacture and sell Model H, and to pay him a royalty of fifty cents for each carburetor sold; that later such a contract was entered into and it provided that in case the company failed to manufacture the carburetor for a period of ninety days, became insolvent or went into the hands of a receiver, the right of the company under the contract was forfeited. At the time the auditor's report and balance sheet just referred to were made and presented to the stockholders, the company had not yet entered into any contract for the right to manufacture carburetor Model P. In fact, the evidence shows that immediately following the acceptance of the auditor's report, Van Briggle stated that he had placed a "very conservative value" upon the right to manufacture Carburetor Model P, which he was presenting to the company "without any compensation whatever, except the regular royalty agreement" which was at the time presented for consideration. The contract giving the company the right to manufacture Carburetor Model P was not entered into until February 11, 1919, and was, in substance, the same as the contract theretofore entered into giving the company the right to make and sell Model H. No money or thing of value was paid for either of these contracts, yet they were counted as assets, the first as being worth $125,000, and the second as being worth $150,000. It is a well-founded rule of accounting that nothing should be carried as an asset that cannot be sold or converted into cash, and under the terms of these contracts, neither of them was subject to sale and could not have been converted into cash and

had no place among the assets of the company. The only apparent reason for giving them a value and carrying them as assets was to increase the assets on paper so as to show a surplus instead of a deficit.

The evidence also shows that later a similar contract was entered into with Van Briggle by which the company was given the right to make and sell a shock absorber for which Van Briggle had a patent and which was thereafter adjudged to be an infringement on a patent held by others. Nothing was paid for this contract, but it was carried as an asset, the value being placed at $250,000, which also increased the assets and made it possible to show a surplus. That neither of these contracts should have been carried as assets is conclusively shown by the fact that when the company went into the hands of a receiver, Van Briggle declared all of them forfeited and demanded that all patterns, tools and jigs used in the manufacture of these carburetors and shock absorbers be turned over to him. There is evidence from which the jury was authorized to find that the company was insolvent from and after the first meeting of the directors, when Van Briggle was given $125,000 of the capital stock of the company, that it was operated at a loss at all times and was kept a going concern only by reason of an extensive stock-selling campaign. The directors at a regular meeting authorized and directed Van Briggle to sell the stock for the purpose of raising money for the use of the company.

As a part of this stock-selling campaign, Van Briggle, as president of the company, with the knowledge of appellants, sent out letters and literature to all of their stockholders and prospective purchasers of stock containing false statements concerning the financial affairs of the company, the value of the stock, the amount of profits being made, and urging the stockholders to buy more stock and urging others to buy. Van Briggle

began sending these letters in May, 1919, and continued sending them until January, 1920. There is also evidence that the balance sheet made at the end of 1919 was not correct and did not show the true financial condition of the company. That appellants Rominger and Stout, along with others, had their attention called to the fact that an item of over $40,000 for advertising was being carried as an asset under the head of good-will, when it should have been carried as an expense, and that, if it were placed where it belonged and was carried as a liability instead of an asset, the statement would show a deficit instead of a surplus. The auditor testified that he called Rominger's attention to this and that the latter insisted that it be carried as good-will, as he had promised the stockholders they would be paid a dividend and it could not be done if this item were charged to expense; that, while the auditor and at least one director insisted on carrying it as expense, they were overruled, appellant Stout joining with those who wanted it carried as good-will. No good purpose can be served by making a detailed statement of the evidence. It is abundantly sufficient to prove that there was a conspiracy among some of the directors and officers of the company to sell and dispose of the stock of the company, which was practically worthless, at prices several times more than it was worth to an innocent public; that all of the appellants became active members of this conspiracy by joining in this selling campaign, and by making statements to appellee which they should have known were untrue, and which were made for the purpose of inducing him to buy stock in the company to their financial advantage. Appellant Shepard was a stock salesman, and, as such, he sold practically all of the stock of the company that was sold, and received a twenty per cent. commission for all stock sold by him. Appellant Amsbury assisted him and received five per cent. commission for his work.

While Shepard and Amsbury were not officers or directors of the company, and probably did not know the exact financial condition of the company, or the value of the stock they were selling, the evidence is sufficient to connect them with the unlawful acts and conspiracy of those in charge of the financial affairs of the company to make them parties to such conspiracy and to hold them accountable for the acts and statements of others made in aid of and in carrying out such conspiracy. And we hold the evidence is sufficient to sustain the verdict as to each appellant.

There was no error in admitting evidence showing the gift of 1,250 shares of stock to Van Briggle or that he gave 500 of these shares to Rominger, or in showing what Rominger and others paid for their stock, as that would tend to show the value of the stock of the company and to show the falsity of statements made concerning the financial condition of the company.

The fact that appellee made some investigation on his own accord and did not rely entirely on the statements and representations of appellants and others associated with them, does not prevent appellee from recovering a judgment against appellants.

Appellants also contend the amount of the recovery is excessive. Appellee had purchased 102 shares of the capital stock for which he paid more than $15,000. Seventy of these shares were purchased in April, May and July 1919. Thirty-two shares were purchased in January and February, 1920. He paid $6,400 for the last thirty-two shares. He recovered a verdict for $8,000. · Thirty of the thirty-two shares of stock last purchased by appellee were purchased February 23, 1920, which was after practically all of the letters and literature in aid of the stock-selling campaign had been mailed by Van Briggle, over his signature as presi-

dent of the company. Appellee paid $6,000 for these thirty shares. Six thousand dollars, plus six per cent. interest to the date of the verdict, is just $4 less than the amount of the verdict, so it would seem that the verdict is based on this last sale. The evidence was sufficient to show a conspiracy on the part of some of the directors including Van Briggle, Rominger and Stout antedating the first purchase of stock by appellee; that appellants Amsbury and Stout became parties to this conspiracy, and that the conspiracy continued down to the time when the last stock was purchased by appellee. The thirty-two shares last purchased were all purchased by appellee following the payment of a ten per cent. dividend, which had been represented as being paid out of earnings and surplus, such dividends being paid out of money borrowed for that purpose. The seventy shares of stock were purchased very soon after Amsbury introduced Shepard to appellee and after Amsbury and Shepard had frequently called on appellee and urged him to buy, and when, for the purpose of inducing him to buy, they made untruthful statements as to the company and its financial condition. It would have been a miscarriage of justice for the jury not to have found there was a conspiracy on the part of Van Briggle, Rominger, Stout and Shepard to fraudulently sell stock to the public, of which appellee was one, and whether appellant Amsbury became a party to such conspiracy was a question of fact for the jury. The jury found he did, and the evidence is sufficient to sustain that finding. The amount of the verdict is well within the evidence, and cannot be disturbed on the ground that it is excessive.

We have given careful consideration to appellants' contentions that the court erred in admitting evidence, and in giving and refusing to give certain instructions, but find no reversible error.

Judgment affirmed.